1999 ME 119

**CENTRAL MAINE POWER CO.**

**v.**

**PUBLIC UTILITIES COMMISSION.**

Supreme Judicial Court of Maine.

Argued Dec. 1, 1998.
Decided July 29, 1999.

Catherine R. Connors (orally), William D. Hewitt, Pierce Atwood, Portland, for appellant.

Andrew Ketterer, Attorney General, Elizabeth J. Wyman, Asst. Atty. Gen., (orally), Joanne B. Steneck, Public Utilities Commission, Augusta, for appellee.

Eric J. Bryant, Maine Public Advocate, Beth Nagusky, Independent Energy Producers of Maine, Augusta, Eric J. Uhl, Moon, Moss, McGill, Hayes & Shapiro, P.A., Portland, for Maine Civil Liberties Union, amici curiae.

Before CLIFFORD, RUDMAN, DANA, and SAUFLEY, JJ.

CLIFFORD, J.

[¶ 1] Central Maine Power Company (CMP) appeals the Public Utilities Commission's promulgation of a rule (Commission Rule) requiring electric transmission and distribution (T & D) facilities to file with the Commission any educational materials the T & D facilities plan to distribute to the public in regard to retail access to electricity generation services. CMP contends, *inter alia*, that: (1) the Commission Rule regulates noncommercial core speech; (2) the Commission Rule's section 6(B) pre-dissemination submission requirement constitutes an unconstitutional prior restraint on core speech; and (3) the Commission Rule's section 7 inclusion and correction requirements constitute unconstitutional content-based restrictions on core speech. Although we find no constitutional infirmity in section 7 of the Commission Rule, we agree that the pre-dissemination submission requirement of section 6(B) of the Commission Rule is an unconstitutional prior restraint on core speech and accordingly, we vacate that section of the Commission Rule.

## I. RESTRUCTURING AND RETAIL ACCESS

[¶ 2] As have many other states, the Maine Legislature enacted legislation restructuring the state's electricity industry. *See* P.L.1997, c. 316; *see also* 35–A M.R.S.A. §§ 3201–3217 (Supp.1998). Beginning on March 1, 2000, Maine citizens will have the right to purchase electricity generation services from the competitive electricity generation provider of their choice. *See* § 3202(1). Under the current system, Maine residents purchase electricity from integrated, noncompetitive, regulated public utilities. Pursuant to the recent legislation, these investor-owned electric utilities are required to divest all assets relating to the generation of electricity. *See* § 3204(1). They will maintain their transmission and distribution assets, however, and will remain regulated as T & D facilities. The independent electricity generation providers will be licensed by the Commission, but otherwise will not be subject to regulation as public utilities. *See* §§ 3202(2), 3203(1), (2), (5). After March 1, 2000, T & D facilities "may not own, have a financial interest in or otherwise control generation or generation-related assets[,]" except "to the extent that the [C]ommission finds that ownership, interest or control is necessary for the utility to perform its obligations as a transmission and distribution utility in an efficient manner." *See* § 3204(5), (6).

[¶ 3] The deregulated system does contemplate affiliations between competitive electricity generation providers and T & D facilities.[1] The statute, however, does not

---

1. Section 3205(1)(A) defines an "affiliated competitive provider" as "a competitive electricity provider whose relationship with a large investor-owned transmission and distribution utility qualifies it as an affiliated interest." An "affiliated interest" is defined as:

 (1) Any person who owns directly, indirectly or through a chain of successive ownership, 10% or more of the voting securities of a public utility;

 (2) Any person, 10% or more of whose voting securities are owned, directly or indirectly, by an affiliated interest as defined in subparagraph (1);

 (3) Any person, 10% or more of whose voting securities are owned directly or indirectly, by a public utility;

 (4) Any person, or group of persons acting in concert, which the [C]ommission may determine, after investigation and hearing, exercises substantial influence over the pol-

permit a T & D facility to "engage in joint advertising or marketing programs of any sort with its affiliated competitive provider" or "promote or market any product or service offered by its affiliated competitive provider." *See* § 3205(3)(J) (further prohibiting T & D facilities from promoting affiliated competitive electricity providers in any manner).

[¶ 4] The Legislature gave the Commission the express statutory authority to oversee the transition to the new deregulated system. The statute requires the Commission to establish rules regarding "consumer protection standards and standards to protect and promote market competition in order to protect retail consumers of electricity from fraud and other unfair and deceptive business practices." *See* § 3203(6). Particularly, the statute requires the Commission to adopt rules implementing an education program to inform consumers about the deregulation process. *See* § 3213(2).

[¶ 5] On November 3, 1997, the Commission issued a Notice of Rulemaking that set out the proposed Rule establishing a consumer education program, explained each section of the Rule, established a time and place for a public hearing, and identified the procedure for public comment. The notice stated that "the consumer education program is designed to facilitate informed decision making by consumers and to provide an objective and credible source of information to consumers." The costs of education programs undertaken by T & D facilities pursuant to the Commission guidelines may be recoverable through increases in current electricity rates, *see* proposed Commission Rule § 6(A). In December, CMP submitted comments to the proposed Commission Rule. CMP wrote, "Although CMP is willing to work with the Commission to educate the public on retail access issues, CMP is concerned by the substantial restraints that the proposed rule would im-

pose on an electric utility's First Amendment rights to free speech."

[¶ 6] The Commission conducted a public hearing on the proposed Rule on January 30, 1998. The Commission responded to some stated concerns, provisionally adopted the Rule, and then submitted the Rule to the Legislature for review and approval pursuant to 35–A M.R.S.A. § 3213(2)(C) and 5 M.R.S.A. §§ 8071–8074 (Pamph.1998). The Legislature authorized the final adoption of the Rule with only two minor changes. *See* Resolves 1997, c. 99. CMP filed this appeal pursuant to 35–A M.R.S.A. § 1320 (1988).

[¶ 7] The following sections of the Commission Rule are the subject of this appeal:

§ 6 UTILITY–SPONSORED EDUCATIONAL ACTIVITIES

A. *Ratemaking Treatment.* The costs of utility-sponsored educational activities shall not be included in electric or transmission and distribution utility rates unless the utility demonstrates in a ratemaking proceeding that expenditures for utility-sponsored educational activities are reasonable in amount, reasonably effective, necessary and in the public interest.

B. *Informational Filings.* Electric and transmission and distribution utilities shall file with the Commission, for informational purposes only, any materials that are part of or related to utility-sponsored educational activities. The materials shall be filed, whenever possible, at least three weeks before the commencement of the activity of which the materials are a part or to which the materials relate.

C. *Investigation.* The Commission may investigate any utility-sponsored educational activity if it finds after a summary investigation that there are sufficient grounds to investigate whether the activity is misleading, deceptive or inac-

icies and actions of a public utility provided that the person or group of persons beneficially owns more than 3% of the public utility's voting securities;

(5) Any public utility of which any person defined in subparagraphs (1) to (4) is an affiliated interest.

35–A M.R.S.A. § 707(1)(A)(1), (4) (1988).

curate. If after a public hearing, the Commission finds that the utility-sponsored activity is misleading, deceptive or inaccurate, it may by order require the utility to cease the activity and provide corrections of that activity.

## § 7 DISSEMINATION OF INFORMATION

The Commission may require that electric and transmission and distribution utilities disseminate information produced as part of the Commission's consumer education program. Information required to be disseminated by the utility may include correction of any utility-sponsored education activity to the extent such correction is required by the Commission as a result of an investigation, undertaken pursuant to section 6(C).

## II. THE FIRST AMENDMENT RIGHT TO FREE SPEECH

[¶ 8] The First Amendment to the United States Constitution, applicable to the states through the Due Process Clause of the Fourteenth Amendment, provides that "Congress shall make no law ... abridging the freedom of speech, or of the press ...." [2] U.S. Const. amends. I, XIV; *see Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The United States Supreme Court has interpreted the First Amendment as preventing governments from proscribing speech or expressive conduct solely on the basis of disapproval of the ideas expressed.[3] *See R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). Freedom from content-based regulation, however, is not absolute. Obscenity and speech tending to incite immediate breach of the peace do not enjoy any First Amendment protection. *See, e.g., Miller v. California,* 413 U.S. 15, 23–24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571–72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Commercial speech is entitled to a form of intermediate constitutional protection. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 562–65, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Only "core speech" or "pure speech" is entitled to strict constitutional protection.[4] *See, e.g., R.A.V.,* 505 U.S. at 395, 112 S.Ct. 2538.

## A. COMMERCIAL SPEECH v. CORE SPEECH

[¶ 9] Commercial speech is "expression related solely to the economic interests of the speaker and its audience," *Central Hudson Gas & Elec.,* 447 U.S. at 561, 100 S.Ct. 2343, speech that relates to a particular product or service, *see Friedman v. Rogers,* 440 U.S. 1, 10, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979), or speech that "propose[s] a commercial transaction," *Board of Trustees of State Univ. v. Fox,* 492 U.S. 469, 473–74, 109 S.Ct. 3028, 106 L.Ed.2d

2. The Maine Constitution likewise reads, "Every citizen may freely speak, write and publish sentiments on any subject, being responsible for the abuse of this liberty; no laws shall be passed regulating or restraining the freedom of the press ...." Me. Const. art. 1, § 4. With respect to free speech rights, "[t]he Maine Constitution is no less restrictive than the Federal Constitution." *State v. Janisczak,* 579 A.2d 736, 740 (Me.1990).

3. The Supreme Court has upheld reasonable time, place, or manner restrictions, but only if those restrictions "are justified without reference to the content of the regulated speech ...." *See Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (citations omitted). We have also recognized the distinction between content-based restrictions and reasonable time, place, and manner restrictions. *See Janisczak,* 579 A.2d at 739 n. 6. Because the Commission will require the T & D facilities to change the content of the education materials with which the Commission disagrees, the parties agree the restrictions are content-based.

4. In recent Supreme Court cases, several justices, writing in concurrence, have suggested that the lower constitutional standard for commercial speech is inappropriate in circumstances when the state imposes a complete ban on information for paternalistic reasons. *See, e.g., 44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 523, 526, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (*Thomas, J.* concurring). Those concerns have not been raised in this case.

388 (1989) (quoting *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)). On the other hand, core speech, enjoying the fullest constitutional protection, involves "discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes[,]" *Mills v. Alabama*, 384 U.S. 214, 218–19, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966), speech directed at educating the public, *see Thornhill v. Alabama*, 310 U.S. 88, 95, 102, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), or more generally, speech addressing "matters of public concern," *id.* at 101–02, 60 S.Ct. 736.

 [¶ 10] Speech will not be characterized as commercial speech solely because the speaker is a corporation. *See First Nat'l Bank v. Bellotti*, 435 U.S. 765, 777, 784, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). The First Amendment protects equally the free speech rights of corporate persons and natural persons.[5] *See id.* The identity of the source does not determine the level of protection the First Amendment affords the speech. *See id.* Furthermore, speech does not automatically lose any constitutional protection solely because it involves a commercial subject. *See Virginia State Bd. of Pharmacy*, 425 U.S. at 761, 96 S.Ct. 1817. Commercial speech must be distinguished from core speech based on its content. *See id.* Speech involving purely factual material of public interest is fully protected by the First Amendment, even if the subject of the speech is a commercial matter. *See id.* at 761–62, 96 S.Ct. 1817.

 [¶ 11] Because the Commission Rule at issue is directed at "utility-sponsored educational activities," which by definition are designed to educate consumers about retail access in a deregulated system, *see* Commission Rule § 2(D), noncommercial core speech is what is being regulated. The statute forbids T & D facilities from promoting an affiliated competitive provider in any manner. *See* 35 M.R.S.A. § 3205(3)(J). To be in compliance with the law, a T & D facility will merely educate the public about the deregulated system and their future right to purchase electricity generation services from competitive providers, and will not disseminate educational materials directly implicating the facility's economic interests or proposing a commercial transaction to the consumers who receive the materials. Education about deregulation is a matter of state public concern. That the subject matter of the educational materials is commercial does not reduce its constitutional protection. *See Virginia State Bd. of Pharmacy*, 425 U.S. at 761, 96 S.Ct. 1817. The Commission Rule essentially *prohibits* educational materials from containing commercial speech.[6]

5. The speech of heavily regulated monopolies likewise is protected by the First Amendment. *See Consolidated Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530, 534 n. 1, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980).

6. Prior to the enactment of the Commission Rule, CMP designed a brochure to answer consumer questions about deregulation. The materials educate the public about deregulation. They do reference CMP's affiliates generally, but not by name. In response to the question, "Can I decide to continue purchasing power from CMP?," the brochure states, "Customer[s] may be able to purchase electricity from an affiliate of CMP but Maine's law prohibits a CMP marketing affiliate from selling more than 33% of the kilowatt hours sold in its current service territory. If 33% is reached, you will have to find another supplier." In response to the question. "Who will be selling electricity?," the brochure states, "New, unregulated energy companies associated with CMP and Bangor Hydro can offer electricity to you, as long as they don't provide more than 33% of the electricity sold in their current territories." Those are the only two references to affiliates of CMP. Given the overall educational value of these materials, it would be difficult to characterize them as commercial speech. *See Pacific Gas & Elec. Co. v. PUC*, 475 U.S. 1, 8–9, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (electric company newsletter that included energy saving tips, stories about wildlife conservation, recipes, and billing information received full constitutional protection because newsletter extends well beyond speech that proposes business transaction and discusses matters of public concern).

## B. PRIOR RESTRAINTS ON CORE SPEECH

■ [¶ 12] The Supreme Court has explained that "[t]he freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." *Thornhill*, 310 U.S. at 101–02, 60 S.Ct. 736. The concept of prior restraint refers to "administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993) (quoting M. NIMMER, NIMMER ON FREEDOM OF SPEECH § 4.03, 4–14 (1984)). Writing a dissent in *Alexander*, Justice Kennedy stated, "In its simple, most blatant form, a prior restraint is a law which requires submission of speech to an official who may grant or deny permission to utter or publish it based upon its contents." *Id.* at 566, 113 S.Ct. 2766; *see also Kingsley Books v. Brown*, 354 U.S. 436, 441, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957) (stating that prior restraints must "be closely confined so as to preclude what may fairly be deemed licensing or censorship").

■ [¶ 13] Because prior restraints have an immediate and irreversible sanction of suppressing speech before it occurs, there is a heavy presumption against their constitutional validity. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559, 589, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) (*Brennan, J.* concurring); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971). Prior restraints on speech can be unconstitutional, even if subsequent redress of harm is not prohibited. *See Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 714, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Prior restraints are only upheld in exceptional circumstances where the restraint prevents the disclosure of information that would cause irreparable damage to the country in a time of war or would incite violence, *see id.* at 716, 51 S.Ct. 625, or where, in the case of obscenity, procedural safeguards are in place to "reduce the danger of suppressing constitutionally protected speech," *see Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

■ [¶ 14] The Commission Rule's requirement that educational materials be submitted to the Commission three weeks prior to dissemination constitutes a prior restraint on core speech.[7] *See Organization for a Better Austin*, 402 U.S. at 418–20, 91 S.Ct. 1575 (invalidating order enjoining organization from distributing leaflets in the town critical of local real estate agent as a prior restraint on speech). Section 6(B) of the Commission Rule requires T & D facilities to submit their education materials to the Commission "for informational purposes only ... whenever possible, at least three weeks ..." prior to disseminating the materials to the public. Presumably, the T & D facility cannot disseminate the materials during this three week period. Thus, although the Commission's restriction on the publication of the materials is temporary, it nevertheless is a prior restraint on the utilities' speech.

[¶ 15] Section 6(B) of the Commission Rule applies when a public hearing is concluded within the three week period and

---

**7.** The Commission contends that the prior restraint doctrine is inapplicable to regulated utilities. The Supreme Court has *not* directly applied the prior restraint doctrine in a regulated utility context. In *Central Hudson Gas and Electric,* the Supreme Court invalidated the Public Service Commission order banning advertising that promotes the use of electricity. *See* 447 U.S. at 569–570, 100 S.Ct. 2343. The Supreme Court, however, noted that the Public Service Commission "might consider a system of previewing advertising campaigns to insure that they will not defeat conservation policy." *Id.* at 571 n. 13, 100 S.Ct. 2343. We read this not as a suggestion that there is an exception to the prior restraint doctrine for highly regulated industries, but rather as being based on the commercial nature of the speech because, as the court explained, "commercial speech is such a sturdy brand of expression that traditional prior restraint doctrine may not apply to it." *Id.*

the Commission determines that corrections to the educational materials are warranted. After receiving the materials, the Commission will conduct a summary investigation to decide if a public hearing is needed to evaluate whether the subject matter of the materials is appropriate for publication. *See* Commission Rule § 6(C). If a public hearing is held and the Commission determines that the materials are misleading, inaccurate, or deceptive, the Commission will require the T & D facility to correct the portions of the educational materials of which the Commission disapproves. *Id.* If the hearing is completed within the three week period and changes are necessary, the T & D facility will be required to correct its materials prior to their initial dissemination.[8] As is contended in the *amicus curiae* brief, "In effect, the [Commission] does not want any speech to go to consumers regarding restructuring and retail access *unless it is speech with which [it] agrees.*"

[¶ 16] The Commission contends that the phrase "whenever possible" precludes the Rule from being characterized as a prior restraint. Prior restraints are prohibited because they have the effect of suppressing speech before it occurs. *See Nebraska Press Ass'n,* 427 U.S. at 559, 589, 96 S.Ct. 2791. The "whenever possible" language will not alter that effect. CMP does not know how the Commission will interpret the phrase "whenever possible." To ensure it has complied with the Commission Rule, CMP must submit the materials three weeks prior to the dissemination or justify its failure to do so.

[¶ 17] The Commission further contends that section 6(B) does not constitute a prior restraint because the Rule and the applicable statute do not impose any sanctions for noncompliance and the Rule explicitly provides that the submission is "for informational purposes only." That phrase does not save the Commission Rule from being characterized as a prior restraint. The Commission's comments to section 6(B) of the Rule, as the comments appear in the Commission's order provisionally adopting the Rule, state:

> The purpose of subsection 6(B) is to inform the Commission prior to implementation of utility-sponsored educational activities so that the Commission can work with the utility to avoid inconsistent or contrary educational messages. We note that although the provision does not require approval by the Commission, we would expect the utility to cooperate with the Commission in redrafting messages to avoid confusion to consumers.

As CMP contends, because of the ongoing nature of the regulatory relationship between T & D facilities and the Commission, the language of section 6(B) of the Commission Rule, when combined with the language of sections 6(C) and 7, is essentially the same as a requirement of Commission approval. Although there is nothing to suggest that the Commission has or will misuse its power in this area, coercion, persuasion and intimidation could effectively suppress speech even though formal legal sanctions are not available or are not utilized.[9] *See Bantam Books, Inc. v. Sulli-*

---

8. After the three week period, a T & D facility is free to disseminate its materials, even if a public hearing is pending. In circumstances when a public hearing cannot be concluded within the three week period, the T & D will have disseminated the materials prior to any determination by the Commission that the content of the materials must be changed. Requiring the T & D facility to change the contents of its material after dissemination is technically subsequent punishment, not a prior restraint. Still, the T & D facility will have been forced to postpone its publication during that three week period. The ultimate ability to disseminate the desired communication does not change the fact that there is a period of time during which the T & D facility would be denied the ability to exercise its free speech rights.

9. CMP suggests that civil penalties totaling up to $1,000 may be available for failure to comply with Commission requirements. *See* 35–A M.R.S.A. § 1508 (1988). The Commission notes, however, that the general penalty provisions of Title 35–A are not applicable to violations of this Rule and were not even mentioned during the promulgation of the Rule.

*van,* 372 U.S. 58, 66–67, 68–70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) (prior restraint even though entity " 'free' to ignore the Commission's notices, in the sense that [its] refusal to 'cooperate' would have violated no law."). Section 6(B) of the Commission Rule constitutes an unconstitutional prior restraint on core speech.[10]

### C. CONTENT–BASED RESTRICTIONS ON CORE SPEECH

[¶ 18] Section 7 of the Commission Rule provides:

The Commission may require that electric and transmission and distribution utilities disseminate information produced as part of the Commission's consumer education program. Information required to be disseminated by the utility may include correction of any utility-sponsored education activity to the extent such correction is required by the Commission as a result of an investigation, undertaken pursuant to section 6(C).[11]

Requiring a T & D facility to include the Commission's consumer education materials with its own education materials is a content-based restriction on speech. Requiring a T & D facility to correct the content of its speech likewise is a content-based restriction on speech. As the Supreme Court has explained, mandating speech that a speaker otherwise would not make necessarily alters the content of the speaker's speech. *See Riley v. National Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781, 795, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). Content-based restrictions on core speech, however, may be constitutional if the restrictions are demonstrated to be narrowly tailored to serve a compelling state interest. *See R.A.V.,* 505 U.S. at 395–96, 112 S.Ct. 2538; *Hart v. Secretary of State,* 1998 ME 189, ¶ 9, 715 A.2d 165, 167–68, *cert. denied, sub nom. Hart v.*

*Gwadosky,* —— U.S. ——, 119 S.Ct. 1028, 143 L.Ed.2d 38, 67 USLW 3524 (U.S.Me. Feb.22, 1999) (No. 98–676).

### 1. THE INCLUSION REQUIREMENT

[¶ 19] Relying on the United States Supreme Court decision in *Pacific Gas and Electric Co. v. PUC,* CMP contends that requiring T & D facilities to include Commission educational materials with the materials they disseminate to their customers is an unconstitutional content-based restriction on non-commercial core speech. We disagree.

[¶ 20] In *Pacific Gas,* the Supreme Court struck down a California Utility Commission requirement that a privately owned utility include in its billing envelopes leaflets designed by a third party, outlining positions with which the utility disagreed. *See* 475 U.S. at 5–7, 106 S.Ct. 903. The Supreme Court noted that the California Commission's interest in fair and effective utility regulation *may* be a compelling interest, but concluded that the California Commission's inclusion requirement was not narrowly tailored to achieve the Commission interests. *See id.* at 19–20, 106 S.Ct. 903.

[¶ 21] Several significant differences between *Pacific Gas* and the facts of this case, however, lead us to conclude that the requirements of the Commission Rule are narrowly tailored to serve the Commission's compelling interest. Like the California Commission in *Pacific Gas,* the Commission has a compelling interest in ensuring that consumers get information about deregulation of the electricity generation industry and retail access that is objective, accurate, and comprehensive given the potential for a high degree of customer confusion that can result from retail competition. Unlike the materials at issue in *Pacific Gas,* however, the subject

---

**10.** CMP also contends that the language of section 6(B) of the Commission Rule is unconstitutionally vague. Because we strike the language as an unconstitutional prior restraint on core speech, we do not address this issue.

**11.** Section 6(C) of the Commission Rule provides, "If after a public hearing, the Commission finds that the utility-sponsored activity is misleading, deceptive or inaccurate, it may by order require the utility to cease the activity and provide corrections of that activity."

matter of the material T & D facilities are forced to include within its billing envelopes is narrowly prescribed. In *Pacific Gas*, the utility was required to disseminate highly-opinionated political editorials of third parties that the utility considered to be directly contrary to its interests. *See id.* at 5–7, 106 S.Ct. 903. The materials that a T & D facility would be forced to include in its billing envelopes would be objective descriptions of the deregulation of the electricity generation industry and the retail access choices of consumers. The Commission stated, in support of its adoption of the Rule, "We do not expect that there will be major differences of opinion between the Commission and utilities about the kind of fact-based information that is at issue here." Furthermore, the materials will be generated by the body with the authority to regulate utilities and with the legislative mandate to develop educational program regarding deregulation, not independent third parties. Finally, the alternative of directly mailing its education materials to consumers would hinder the Commission's achievement of its interests, because it would increase the possibility of consumers receiving differing information from different sources. Thus, the Commission Rule's inclusion requirement is narrowly tailored to serve the Commission's compelling interest.

## 2. THE CORRECTION REQUIREMENTS

 [¶ 22] We have concluded that section 6(B)'s requirement that T & D facilities submit their educational materials to the Commission *prior* to dissemination is invalid. Section 6(C) of the Commission Rule, however, permits the Commission to hold a public hearing *after* dissemination and to order the T & D facility to correct materials the Commission finds to be misleading, deceptive, or inaccurate. Section 7 reaffirms that a T & D facility must disseminate the corrected materials to their consumers. CMP contends that

these correction requirements unconstitutionally restrict the free speech rights of T & D facilities. We are unpersuaded by that contention.

[¶ 23] The correction requirements of section 6(C) remedy harm, rather than suppress speech, and thus avoid the constitutional infirmities of the prior restraint set out in section 6(B). Furthermore, the Commission has a compelling interest in "work[ing] with [T & D facilities] to ensure consumers get information that is objective, accurate, and consistent with [the Commission's consumer education] program messages[,]" given "the potential for a high degree of customer confusion that can result from retail competition[.]" *See Pacific Gas*, 475 U.S. at 19, 106 S.Ct. 903. The requirement that the T & D facility correct any information that is misleading, inaccurate, or deceptive is narrowly tailored to serve this interest. This requirement is narrowly focused only on materials that are misleading or deceptive. Although the Commission could disseminate its own materials to clarify misleading, inaccurate, or deceptive statements by a T & D facility as the transition to deregulation occurs, such action could increase consumer confusion as the consumers receive different messages from different sources. Because the requirement that a T & D facility correct misleading, inaccurate, or deceptive materials after those materials have been disseminated serves to remedy harm, rather than suppress speech, in a manner that is narrowly tailored to achieve a compelling government interest, the requirement is constitutional.

## III. EQUAL PROTECTION GUARANTEES

 [¶ 24] The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws."[12] U.S. Const.

---

**12.** Similarly, article I, section 6–A of the Maine Constitution states that "[n]o person shall be ... denied the equal protection of the

laws...." The equal protection guarantees of these provisions are coextensive. *See*

amend. XIV. CMP contends that competitive electricity generation providers and nonelectric utilities, unlike T & D facilities, are permitted to disseminate educational materials regarding deregulation without prior submission to the Commission and without fear of correction or forced inclusion of Commission materials. This disparate treatment, according to CMP, violates equal protection guarantees.

[¶ 25] The Supreme Court has interpreted the Federal Equal Protection Clause to mean that "all persons similarly circumstanced shall be treated alike," reasoning that "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *See Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (citations omitted). The entities to which CMP refers as being treated differently are not similarly situated entities. After deregulation, T & D facilities will remain regulated public utilities that fall within the ambit of the Commission's regulatory authority. Competitive providers of electricity generation services must by licensed by the Commission, but thereafter will not be directly regulated as public utilities. Furthermore, non-electric utilities such as gas utilities are not directly implicated by the deregulation of the electricity generation industry. Thus, the Equal Protection Clause is not implicated by the distinctions in the Commission Rule.

The entry is:

Section 6(B) of the Public Utilities Commission Rule is vacated. Remanded to the Public Utilities Commission.

*Beaulieu v. City of Lewiston*, 440 A.2d 334, 338 n. 4 (Me.1982).