2002 ME 158

## CONSUMERS FOR AFFORDABLE HEALTH CARE, INC.

v.

## SUPERINTENDENT OF INSURANCE et al.[1]

Supreme Judicial Court of Maine.

Argued: Sept. 5, 2002.
Decided: Oct. 16, 2002.

---

1. Anthem Insurance Companies, Inc., and Anthem Health Plans of Maine, Inc., are also appellees.

Joseph P. Ditre, Consumer Health Law Program, Patrick F. Ende (orally), Maine Equal Justice Partners, Augusta, for the appellant.

Peter J. Brann (orally), Brann & Isaacson, Lewiston, Catherine R. Connors (orally), Christopher T. Roach, Pierce Atwood, Portland, for the appellees.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, ALEXANDER, and LEVY, JJ.

ALEXANDER, J.

[¶ 1] Consumers for Affordable Health Care, Inc. (CAHC), appeals from a judgment of the Superior Court (Kennebec County, *Marden, J.*) affirming the Superintendent of Insurance's determination of the value of Blue Cross and Blue Shield of Maine related to its conversion from a nonprofit medical and hospital service organization to a domestic stock insurance company controlled by Anthem Insurance Companies (Anthem). CAHC contends that the Superintendent (1) erred in setting the time at which valuation is determined, and (2) found a fair market value of the aggregate equity of Blue Cross and Blue Shield of Maine that is not supported by substantial evidence in the record. Anthem challenges CAHC's standing to bring this appeal and argues that the appeal is

moot. We reach the merits of the appeal and affirm the judgment of the Superior Court.

## I. CASE HISTORY

[¶ 2] Blue Cross and Blue Shield of Maine (BCBSME) was originally incorporated as a charitable institution to provide nonprofit hospital and medical service plans.[2] See P. & S.L. 1939, ch. 24; P. & S.L. 1943, ch. 21; P.L.1993, ch. 702, § A–19; P.L.1997, ch. 344, § 9. Such nonprofit hospital and medical service organizations may convert to a domestic stockholder owned insurance company with the approval of the Superintendent of Insurance. 24 M.R.S.A. § 2301(9–D) (2000). The approval is conditioned on several factors, including valuation of the corporation and payment of the value of the charitable interest in the converted corporation into a charitable trust. 24 M.R.S.A. § 2301(9–D), (E)(3), (I).

[¶ 3] In the late 1990s, BCBSME's Board of Directors decided that BCBSME should convert to a domestic stock corporation and be sold. After soliciting statements of interest from several potential buyers, the Board determined that Anthem offered what the Board viewed as the strongest proposal.

[¶ 4] Anthem agreed to acquire substantially all of the assets and assume substantially all of the liabilities of BCBSME in a negotiated Asset Purchase Agreement. This agreement contemplated payment of $120 million, with net proceeds of $81.69 million after adjusting for certain of BCBSME's liabilities and the estimated transaction costs. The Asset Purchase Agreement was approved by the Board on July 13, 1999. BCBSME then retained Houlihan Lokey Howard & Zukin Financial Advisors, Inc. (HLHZ), to perform an appraisal of the company for consideration by the Superintendent of Insurance. HLHZ appraised BCBSME's fair market value at $102.5 million as of July 13, 1999, the date of the Asset Purchase Agreement.

[¶ 5] On September 15, 1999, the Board approved a plan, pursuant to 24 M.R.S.A. § 2301(9–D), to convert BCBSME from a nonprofit hospital and medical service organization to a domestic stock insurance company named AHS Liquidating Corporation (AHS Liquidating). The conversion plan and the HLHZ appraisal was then filed with the Maine Bureau of Insurance for approval of the conversion and acquisition. The plan indicated that upon the sale of its assets to Anthem, AHS Liquidating would liquidate and dissolve, with its assets placed into a charitable trust for the benefit of the Maine Health Access Foundation, Inc. (Foundation).[3] The conversion plan anticipated that the role of the trust would be "to fund health care programs that will meet the unmet health care needs of the citizens of Maine."

[¶ 6] Approval and valuation proceedings were initiated in November 1999. The Superintendent of Insurance granted CAHC and others intervenor status in the proceedings.

[¶ 7] During the hearings, the Superintendent heard testimony from over twenty

---

**2.** Under nonprofit hospital and medical service plans, contracting hospitals and physicians provide plan subscribers with medical, surgical, and hospital care. 24 M.R.S.A. § 2301(1)–(2) (2000).

**3.** Concurrent with the filing of the conversion plan, BCBSME and Anthem filed a proposed charitable trust plan with the Attorney General, as required by 24 M.R.S.A. § 2301(9–D)(D) (2000). A modified charitable trust plan was filed in the Superior Court on November 15, 1999. The court first approved the charitable trust plan on December 27, 1999, with a modification and amendments approved on May 26, 2000.

witnesses, including several experts on the issue of valuation. Two finance experts from HLHZ explained their valuation process and how they arrived at the $102.5 million appraisal. The Superintendent also heard and received testimony from two other valuation experts for BCBSME and one valuation expert for CAHC. An expert for the Attorney General also filed an opinion reviewing the HLHZ appraisal and a fairness opinion filed by a BCBSME expert.

[¶ 8] Several experts concluded that the HLHZ appraisal applied appropriate methodologies and arrived at a reasonable valuation. Those experts indicated that the value of BCBSME had declined subsequent to the July 13, 1999, appraisal. Two experts stated that the adjusted fair market value of BCBSME was less than the $81.69 million Anthem had agreed to pay to initiate the Foundation.

[¶ 9] CAHC's expert stated an opinion contrary to the other expert opinions. He testified that while the methodologies utilized by HLHZ were reasonable, he believed that a revaluation of BCBSME would yield a higher valuation because, in part: (1) HLHZ applied too high a discount rate in its discounted cash flow analysis; (2) BCBSME had less business risk than implied in the HLHZ analysis; and (3) BCBSME likely had a higher market share subsequent to the appraisal. The CAHC expert also testified that (1) he had never done a fair market value appraisal of

an insurance company or a managed care company; (2) he had been involved only once in the preparation of a written fairness opinion; and (3) he did not do an independent valuation analysis of BCBSME.

[¶ 10] The Superintendent issued an eighty-five page opinion on May 25, 2000, approving the conversion. The Superintendent relied upon HLHZ's $102.5 million appraisal, adjusted by $18.1 million for the actual losses suffered by BCBSME through the end of 1999, as well as the $3.9 million transaction expenses incurred by BCBSME during the conversion process. With these adjustments, the Superintendent found the fair market value of the Foundation's aggregate equity interest in AHS Liquidating to be $80.5 million. Because the determined fair market value was less than the $81.69 million that Anthem had agreed to provide to the Foundation in the amended Asset Purchase Agreement, the Superintendent approved the transaction as fair and ordered the payment of not less than $81.69 million to the Foundation.

[¶ 11] Following the issuance of the Superintendent's decision, Anthem and BCBSME waited 10 days, as required by 24–A M.R.S.A. § 222(4–A)(C) (2000),[4] then closed their transaction on June 5, 2000. Upon closing, and after the dissolution of AHS Liquidating, Anthem made the required distribution of $81.69 million to the

---

4.  24–A M.R.S.A. § 222(4–A)(C) provides:

    **4-A. Tender offers.** No person may make a tender offer for, or a request or invitation for tenders of, or an agreement to exchange securities for, or otherwise acquire any voting security, or any security convertible into a voting security, of a domestic insurer or of any person controlling a domestic insurer if, as a result of the consummation thereof, the person making the tender offer, request or agreement, would, directly or indirectly, acquire actual control of the insur-

    er or controlling person, and no person may enter into an agreement to merge with or may otherwise acquire control of a domestic insurer or its controlling person, unless:

    . . . .

    **C.** Ten days have elapsed from the date of approval by the superintendent and no injunction or other court order precludes consummation of the offer, request, invitation, agreement or acquisition.

Foundation and assumed the liabilities of AHS Liquidating.

[¶ 12] The day after the closing, June 6, 2000, CAHC filed its petition for review of final agency action, pursuant to M.R. Civ. P. 80C, seeking reversal of the portion of the Superintendent's decision that established the value of the outstanding stock of AHS Liquidating Corporation.[5] After hearing, the Superior Court affirmed the decision of the Superintendent.

[¶ 13] The Superior Court found reasonable the Superintendent's interpretation that 24 M.R.S.A. § 2301(9–D)(I) requires utilization of the appraisal submitted with the conversion plan as a "starting point" to determine the "fair market [value] of the aggregate equity held by the Foundation in the converted insurer [AHS Liquidating]," with the aggregate equity to be an amount "equal to the fair market value of BCBSME plus any projected increases in net assets minus any liabilities reasonably attributable to BCBSME as fair market value deductions." The court also found sufficient evidence in the record to support the Superintendent's determination of value for distribution to the Foundation. This appeal followed.

## II. CAHC STANDING

■ [¶ 14] Anthem contends that CAHC lacks standing because, as found by the Superintendent, "CAHC failed to establish that it would be substantially and directly affected by the [Superintendent's] decision on the proposed acquisition."

■ [¶ 15] The right to appeal from an administrative decision is statutory, with the necessary "standing" of a party dependent upon the wording of the specific statute involved. *New England Herald Dev. Group v. Town of Falmouth*, 521 A.2d 693, 695 (Me.1987); *Singal v. City of Bangor*, 440 A.2d 1048, 1050 (Me.1982). The appeal statute at issue, 24–A M.R.S.A. § 236 (2000), provides, in pertinent part:

1.   In general, judicial review of actions taken by the superintendent or his representatives shall occur [in conformity] with the provisions set forth in the Maine Administrative Procedure Act, Title 5, chapter 375, subchapter VII.

. . . .

3.   *Any person who was a party to the hearing may appeal from an order of the superintendent within 30 days after receipt of notice.* Any person not a party to the hearing whose interests are substantially and directly affected and who is aggrieved by an order of the superintendent may appeal within 40 days from the date the decision was rendered. If the appeal is taken from the superintendent's failure or refusal to act, the petition for review shall be filed within 6 months of the expiration of the time within which the action should reasonably have occurred.

(Emphasis added.)

[¶ 16] In *Superintendent of Insurance v. Attorney General*, 558 A.2d 1197, 1200–01 (Me.1989), we interpreted section 236(3) to confer a "more expansive grant of standing" than that conferred by the Adminis-

---

5.   The Attorney General also filed a petition for review, alleging that "the Superintendent's decision is in violation of statutory provisions, affected by an error of law, and unsupported by substantial evidence on the record insofar as it determined the fair market of the aggregate equity of Blue Cross upon conversion." The Attorney General sought only to reverse the Superintendent's decision and require BCBSME to update the appraisal of the fair market value of the aggregate equity of AHS Liquidating. That action was consolidated with the CAHC action on July 10, 2000. The Attorney General has not appealed from the Superior Court's judgment.

trative Procedure Act (APA), 5 M.R.S.A. § 11001(1) (2002),[6] and we held that the Attorney General, "as a party" to the proceedings before the Bureau of Insurance, had standing to pursue an appeal. *Superintendent of Ins.*, 558 A.2d at 1201.

[¶ 17] CAHC was a "party" to the conversion proceedings. According to the APA, a person[7] who "participat[es] in the adjudicatory proceeding pursuant to section 9054, subsection 1 or 2" is a party to that administrative proceeding. 5 M.R.S.A. § 8002(7) (2002). Without opposition by Anthem or BCBSME, the Superintendent granted CAHC permissive intervenor status pursuant to 5 M.R.S.A. § 9054(2) (2002),[8] permitting CAHC to "engage in discovery, present evidence and conduct cross-examination." As a permissive intervenor, and therefore a party to the conversion proceedings, CAHC has standing to pursue this appeal because "[a]ny person who was a party to the hearing may appeal from an order of the superintendent." 24–A M.R.S.A. § 236(3).

## III. MOOTNESS

[¶ 18] Anthem contends that this appeal is moot, because the "multiple, complex transactions flowing from the acquisition and unfolding since that date [June 5, 2000] cannot now be undone" and, therefore, we cannot order any practical relief. The nature of any relief that may be accorded to CAHC if it is successful is not entirely clear, particularly in light of changes in the economy since the spring of 2000, which could adversely affect any reexamination of valuation. However, we need not determine what future relief might be possible in the circumstances of this case. Even if an action could be moot, we will address the merits of a case in circumstances where: (1) sufficient collateral consequences will result from the determination of the questions presented so as to justify relief;[9] (2) the appeal contains questions of great public concern that, in the interest of providing future guidance to the bar and public, we should address; or (3) the issues are capable of repetition but evade review because of their fleeting or determinate nature.[10] *See*

6. 5 M.R.S.A. § 11001(1) provides:
   **1. Agency Action.** Except where a statute provides for direct review or review of a pro forma judicial decree by the Supreme Judicial Court or where judicial review is specifically precluded or the issues therein limited by statute, any person who is aggrieved by final agency action shall be entitled to judicial review thereof in the Superior Court in the manner provided by this subchapter. Preliminary, procedural, intermediate or other nonfinal agency action shall be independently reviewable only if review of the final agency action would not provide an adequate remedy.

7. "Person" is defined as "any individual, partnership, corporation, governmental entity, association or public or private organization of any character, other than the agency conducting the proceeding." 5 M.R.S.A. § 8002(8) (2002).

8. Section 9054(2) provides: "The agency may, by order, allow any other interested person to intervene and participate as a full or limited party to the proceeding. This subsection shall not be construed to limit public participation in the proceeding in any other capacity." 5 M.R.S.A. § 9054(2) (2002).

9. *See Sordyl v. Sordyl*, 1997 ME 87, ¶ 6, 692 A.2d 1386, 1387 (noting that the collateral consequences doctrine requires an appellant to "demonstrate that a decision on the merits of the appeal will have more than conjectural and insubstantial consequences in the future" (internal quotation marks omitted)).

10. *See Me. Civil Liberties Union v. City of S. Portland*, 1999 ME 121, ¶ 10, 734 A.2d 191, 195 (stating that issues capable of repetition but evading review exist when there is a "reasonable likelihood that the same issues will imminently and repeatedly recur in future similar contexts with serious impact upon important generalized public interests").

*Monroe v. Town of Gray,* 1999 ME 190, ¶ 5, 743 A.2d 1257, 1258–59; *Halfway House, Inc. v. City of Portland,* 670 A.2d 1377, 1380 (Me.1996).

[¶ 19] The exception for "questions of great public concern" applies here. In *King Resources Co. v. Environmental Improvement Commission,* 270 A.2d 863, 870 (Me.1970), we identified several considerations in addressing the great public concern exception, including "the public or private nature of the question presented, the desirability of an authoritative determination for the future guidance of public officers, and the likelihood of future recurrence of the question."

[¶ 20] The conversion of BCBSME to a domestic stock insurer is a question of great importance to the public because the organization, prior to conversion, was both a major health insurer and a public charity with its assets held for the purpose of fulfilling its charitable purposes. *See* 24 M.R.S.A. § 2301(3–C) (2000). Those purposes included:

> [P]roviding access to medical care through affordable health insurance and affordable managed care products for persons of all incomes; identifying and addressing the State's unmet health care needs, particularly with respect to medically uninsured and underserved populations; making services and care available through participating providers; and improving the quality of care for medically uninsured and underserved populations.

*Id.*

[¶ 21] An improper interpretation of the conversion statute, potentially resulting in a lower appraisal value, would affect both the insureds' and the uninsureds' access to health care. Because of the potentially large detrimental results to the public, the organizations, and the administrative agency, an authoritative resolution of the issues is appropriate.

## IV. VALUATION

[¶ 22] When the Superior Court acts in its appellate capacity, we review the administrative record directly to determine whether the agency abused its discretion, committed an error of law, or made findings not supported by substantial evidence in the record. *Green v. Comm'r of Dep't of Mental Health, Mental Retardation & Substance Abuse Servs.,* 2001 ME 86, ¶ 9, 776 A.2d 612, 615.

[¶ 23] A nonprofit hospital and medical service organization's [11] conversion [12] to a domestic stock insurer is governed by 24 M.R.S.A. § 2301(9–D) (2000) (conversion statute). The process of conversion is initiated by filing a "conversion plan," a de-

---

11. Nonprofit hospital and medical service organization is defined as:

   [A] corporation or other entity authorized by the superintendent or organized pursuant to Title 24 for the purpose of providing nonprofit hospital service plans within the meaning of Title 24, section 2301, subsection 1 and nonprofit medical service plans within the meaning of Title 24, section 2301, subsection 2. It does not include any organization that provides only nonprofit health care plans within the meaning of Title 24, section 2301, subsection 3 or a health insurance affiliate as defined in Title 24, section 2308–A.

5 M.R.S.A. § 194–A(1)(K) (2002); *accord* 24 M.R.S.A. § 2301(9–D)(B)(8). The legislature has specifically designated such an organization "a charitable and benevolent institution and a public charity," requiring its assets to be held for the organization's charitable purposes. 5 M.R.S.A. § 194–A(2) (2002).

12. " 'Conversion' means the process by which an organization, with the approval of the superintendent, converts to a domestic stock insurer ...." 24 M.R.S.A. § 2301(9–D)(B)(3); *see also* 5 M.R.S.A. § 194–A(1)(F) (2002).

tailed description of the proposed transaction, with the Superintendent of Insurance. *See id.* § 2301(9–D)(B)(4).[13] Concurrent with the filing of the conversion plan, the organization must file a charitable trust plan with the Superintendent and the Attorney General describing the charitable trust or trusts that will receive the ownership interest of the organization following its conversion to a domestic stock insurer.[14] 5 M.R.S.A. § 194–A(5)(B)(1) (2002); *see also* 24 M.R.S.A. § 2301(9–D)(D); 5 M.R.S.A. § 194–A(2).

[¶ 24] The Attorney General is then required to file an action in Superior Court seeking approval of the charitable trust plan, which triggers the Superintendent's obligation to conduct a review of the conversion plan. 5 M.R.S.A. § 194–A(5)(A)–(B); 24 M.R.S.A. § 2301(9–D)(D). A nonprofit hospital and medical service organization may not amend its charter to become a domestic stock insurer, until the Superintendent conducts an adjudicatory hearing and issues final approval of the conversion plan. 24 M.R.S.A. § 2301(9–D)(C), (E).

[¶ 25] The Superintendent may not finally approve the conversion plan unless, among other requirements, the Superintendent finds that the terms and conditions of the plan are fair and equitable.

*Id.* § 2301(9–D)(E)(1). In making this determination, the Superintendent must consider: "(1) Whether the conversion plan complies with the provisions of and purposes of this subsection and any rules of the superintendent that may be adopted under this subsection[, and] (2) Whether the conversion plan would adversely affect, in any manner, the services to be rendered to subscribers." *Id.* § 2301(9–D)(L).

[¶ 26] The conversion statute contains numerous provisions affecting the contents of the conversion plan. *See id.* § 2301(9–D)(E)–(I). Among those requirements is the appraisal provision at issue:

> The conversion plan must include an appraisal of the fair market value, or range of values, of the aggregate equity of the converted stock insurer to be outstanding upon completion of the conversion plan and, if a range of values, the methodology for fixing a final value coincident with the completion of the transactions provided for in the conversion plan.
>
> (1) The appraisal must enable determinations of value for purposes of:
>
> (a) The amount of cash or other assets that subscribers or the charitable trust will be entitled to receive, without consideration, under the provisions of the conversion

13. The conversion plan is the "written plan that sets forth the provisions required by the superintendent, that is filed with the superintendent pursuant to [24 M.R.S.A. § 2301(9–D)], that sets forth a complete description of the proposed conversion and that contains sufficient detail to permit the superintendent to make the findings required under [24 M.R.S.A. § 2301(9–D)]." 24 M.R.S.A. § 2301(9 D)(B)(4) (2000).

14. Provided the organization has materially changed form, *see* 5 M.R.S.A. § 194–A(1)(I), on or before December 31, 2000, the charitable trust will own 100% of the fair market value of the organization as of the date of the conversion. 5 M.R.S.A. § 194–A(2)(A). If the material change in form occurs after December 31, 2000, however, the charitable trust owns 95% of the fair market value of the organization as of the date of the material change, with the remaining 5% being owned by the subscribers. 5 M.R.S.A. § 194–A(2)(B) (2002). The statute identifies "subscribers," for purposes of defining ownership interest in the charitable trust, as "only those persons who were subscribers on any date in the 3–year period immediately prior to the material change in form, if in each case the person was a subscriber for a period of no less than 3 consecutive months." 5 M.R.S.A. § 194–A(2)(B).

plan required by [section 2301(9–D)(E)(3) and (4)]; and

(b) The price of any shares to be issued pursuant to the optional provisions of a conversion plan permitted by [section 2301(9–D)(G)].

*Id.* § 2301(9–D)(I). As used in the statute, " '[f]air market value' means the value of an organization or an affiliate or the value of the assets of such an entity determined as if the entity had voting stock outstanding and 100% of its stock were freely transferrable and available for purchase without restrictions." *Id.* § 2301(9–D)(B)(6).

[¶ 27] The Superintendent interpreted this provision to require the appraisal to state the fair market value of the converted stock insurer, AHS Liquidating, after adjusting for BCBSME's liabilities. Specifically, the Superintendent interpreted the phrase "fair market value ... of the converted stock insurer to be outstanding upon completion of the conversion plan" to mean "the fair market value of the Foundation's 100% ownership interest in BCBSME following the conversion with the conversion being the mechanism to account for Blue Cross' liabilities."

[¶ 28].The Superintendent explained:

It is the judgment of the Superintendent that the Legislature, in requiring the filing of an appraisal with the conversion plan, intended to have a baseline fair market value of the aggregate equity of the converted insurer established which baseline could be reviewed, questioned, and tested throughout the hearing process. The appraisal becomes the basis for determining the Foundation's aggregate equity in AHS Liquidating (the converted insurer). From that, the Superintendent must determine the amount of any assets to be tendered to the Foundation in recognition of the charitable status of BCBSME.

[¶ 29] CAHC asserts that (1) the statute requires the applicant for conversion to provide the Superintendent with an appraisal that values the company as of completion of the conversion plan, and (2) the Superintendent erred in substituting the adjusted valuation based on the appraisal dated nearly one year prior to the completion of the conversion plan.

■ [¶ 30] The Legislature has charged the Superintendent with administration of the conversion statute, relying on the Superintendent's expertise in insurance and insurance related valuation matters. Our review of agency ratemaking or valuation decisions is particularly deferential because ratemaking or valuation relies heavily on agency expertise in its assigned area. *See Indus. Energy Consumer Group v. Pub. Utils. Comm'n,* 2001 ME 94, ¶ 11, 773 A.2d 1038, 1041; *New England Tel & Tel Co. v. Pub. Utils. Comm'n,* 448 A.2d 272, 279 (Me.1982). Thus, in *Maine AFL–CIO v. Superintendent of Insurance,* 595 A.2d 424, 429 (Me.1991), we stated:

We do not, nor should we attempt to second-guess the Superintendent on matters falling within the realm of his expertise .... We will interfere only when the Superintendent abuses the discretion entrusted to him, fails to follow a legislative mandate or violates the federal or states constitutions .... We also accord due consideration to the Superintendent's interpretation and application of technical statutes and regulations and will overturn the Superintendent's action only if the statute or regulation plainly compels a contrary result.

(Citations omitted.)

[¶ 31] The language of 24 M.R.S.A. § 2301(9–D)(I) supports the Superintendent's interpretation. The statute provides that the "conversion plan must include *an* appraisal," *id.,* indicating that

only one appraisal of the fair market value of the converted stock insurer is necessary. Because the applicant files the conversion plan, 24 M.R.S.A. § 2301(9–D)(B)(4), and the conversion plan must include an appraisal, *id.*, § 2301(9–D)(I), it is logical that the applicant bears the burden of supplying the Superintendent a valuation of the company. The statute does not require the submission of additional comprehensive appraisals after the conversion plan is filed.

[¶ 32] The Superintendent is also correct that the statutory phrase "upon completion of the conversion plan" refers to the valuation of the "aggregate equity of the converted stock insurer." *Id.* The phrase does not refer to the appraisal, as argued by CAHC.

[¶ 33] Reading the appraisal provision as a whole indicates that the appraisal must be of the fair market value of the aggregate equity of the converted stock insurer, AHS Liquidating, that will be outstanding at the completion of the conversion plan. Because "[t]he appraisal must enable determinations of value for purposes of ... [t]he amount of cash or other assets that ... the charitable trust will be entitled to receive," *id.* § 2301(9–D)(I)(1), the appraisal itself cannot provide the final valuation of the company. The Superintendent, therefore, was acting within the range of his authority and expertise in interpreting the statute to require that applicants submit an appraisal with the conversion plan that provides a "baseline fair market value of the aggregate equity of the converted insurer" from which the Superintendent could later determine AHS Liquidating's fair market value at the time of completion of the conversion plan. *See id.*

[¶ 34] Because the statute prohibits the organization's amendment of its charter unless the Superintendent conducts an ad-judicatory hearing and approves the plan, *id.* § 2301(9–D)(C), an applicant for conversion cannot know the exact date of conversion, or even whether the conversion will be approved. It would be impossible for an applicant to submit an appraisal at the time the conversion plan is filed that values the company upon an unknown conversion date. CAHC contends that an applicant may set a conversion date far in the future and then must base the appraisal upon that date. However, this approach would result in an overly speculative fair market value determination. In this case, that might have resulted in less funds being allocated to the charitable trust.

[¶ 35] The appraisal submitted by BCBSME complied with the Superintendent's interpretation of the appraisal provision. That appraisal expressed an opinion on the fair market value of the company by assuming that completion of the conversion plan was July 13, 1999, the date of the Asset Purchase Agreement. The Superintendent, therefore, properly relied upon HLHZ's appraisal as a starting point to determine the fair market value of the converted insurer.

## V. THE $18.1 MILLION LOSS ADJUSTMENT

■ [¶ 36] In determining the fair market value of the aggregate equity of the converted insurer to be $80.5 million, *see* 24 M.R.S.A. § 2301(9–D)(I), the Superintendent utilized the following formula: "the aggregate equity of the charitable Foundation in AHS Liquidating is equal to the fair market value of BCBSME plus any projected increases in net assets minus any liabilities reasonably attributable to BCBSME as fair market value deductions." The Superintendent defined "fair market value adjustments as those which were not included in the HLHZ appraisal, that represent actual, not projected, num-

bers, and are attributable to Blue Cross and not some other entity."

[¶ 37] In applying the formula, the Superintendent found reasonable the HLHZ appraisal, which established the fair market value of the aggregate equity for the converted insurer to be $102.5 million as of July 13, 1999. The Superintendent next concluded that the record did not support any net increases in profitability. Although CAHC's expert testified that BCBSME's profitability had increased from the time that HLHZ conducted its appraisal, the Superintendent found this testimony incredible because, "aside from these bare assertions, there is nothing in the record to support [the expert's] theory."

[¶ 38] The Superintendent then subtracted two adjustments from the $102.5 million appraisal value to arrive at the fair market value of BCBSME: (1) $18.1 million in actual losses sustained by BCBSME as of year end 1999, $10 million of which represented Y2K compliance expenses, and (2) $3.9 million for BCBSME's share of the conversion transaction expenses. Focusing on the adjustment for actual losses, CAHC contends that the Superintendent improperly deducted the $18.1 million because (1) the portion of those expenses representing Y2K expenses were already taken into account by HLHZ, and (2) HLHZ already "substantially reduced its valuation of BCBSME on the assumption that BCBSME would not meet its financial projections" by applying a high discount rate in its discounted cash flow analysis.

[¶ 39] In arriving at the fair market value determination of $102.5 million, the HLHZ appraisal utilized both the market capitalization [15] and discounted cash flow [16] approaches, the basis for both being management-provided projections, or forecasted operating results, for the years 1999 to 2001. The management-provided projections estimated that BCBSME would expend an additional $6.1 million above and beyond the amount budgeted to make its computers Y2K compliant.[17] Because those expenses were nonrecurring, HLHZ adjusted the projections by adding the Y2K expenses back into the earnings stream. The $102.5 million appraisal, therefore, reflected the assumption that the Y2K expenses had no impact upon the value of BCBSME.

■ [¶ 40] Because BCBSME's conversion to a domestic stock insurer was complete prior to December 31, 2000, the Foundation was entitled to "100% of the fair market value of the organization" as of the date of the conversion. 5 M.R.S.A. § 194–A(2)(A). "In determining fair market value, consideration must be given to value as a going concern, market value, investment or earnings value, net asset value and a control premium, if any." *Id.* § 194–A(1)(G). A conclusion regarding the net asset value [18] necessarily requires

---

15. The market capitalization approach examines evidence from comparable publicly-traded companies as well as recently acquired companies to estimate the value of a company.

16. The discounted cash flow approach "is based on the premise that the value of an investment is equal to the present value of the future cash flows."

17. In actuality, BCBSME incurred approximately $10 million in Y2K expenses.

18. A company's net asset value, or book value, is calculated by subtracting intangible assets such as goodwill and patents, current liabilities, and long-term liabilities from a company's total assets. *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 685 n. 4 (3d Cir.1991) (defining book value from an excerpt from Barron's Dictionary of Finance and Investment Terms).

an adjustment for losses actually sustained after the completion of the appraisal. The Superintendent, therefore, reduced the fair market value by those Y2K compliance expenses actually incurred, because HLHZ did not adjust its valuation to reflect those losses.

[¶ 41] The Superintendent did not err in adjusting the fair market value by BCBSME's actual losses sustained in 1999. The discount rate selected by HLHZ was based upon a projection that BCBSME would earn approximately $4.6 million in 1999. BCBSME not only failed to fulfill that projection, but it also sustained losses in the amount of $18.1 million. Because there is no evidence in the record that HLHZ assumed an $18.1 million loss in arriving at the discount rate, the Superintendent properly reduced the fair market value by that amount and did not double count Y2K expenses in doing so.

The entry is:

Judgment affirmed.

