2004 ME 45

**YORK INSURANCE OF MAINE, INC.**

v.

**SUPERINTENDENT OF INSURANCE.**

Supreme Judicial Court of Maine.

Argued: Jan. 14, 2004.

Decided: April 7, 2004.

---

G. Steven Rowe, Atty. Gen., Andrew L. Black, Asst. Atty. Gen. (orally), Augusta, for appellant.

James D. Poliquin (orally), Norman, Hanson, Portland, for appellee.

Panel: CLIFFORD, and RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

ALEXANDER, J.

[¶ 1] The Superintendent of the Bureau of Insurance appeals from a decision of the Superior Court (Cumberland County, *Crowley, J.*), vacating decisions of the Superintendent in two appeals of nonrenewal of homeowner's insurance policies. In each case, York Insurance of Maine had declined to renew a homeowner's policy because the policyholders operated a daycare business at their home, even though each policyholder had a separate commercial liability policy covering the daycare business. After a hearing, the Superintendent found that York had not met its burden of proving that the reasons for

nonrenewal were "good faith reason[s] rationally related to the insurability of the property," as required pursuant to 24–A M.R.S.A. § 3051 (2000). The Superior Court vacated the decisions, and the Superintendent filed this appeal. We affirm the judgment of the Superior Court.

## I.  CASE HISTORY

[¶ 2] The case involves two homeowner's insurance policies issued by York Insurance Company. The policies contain identical business pursuits exclusions [1] and endorsements [2] stating that a home daycare is an excluded business. There is no dispute that under both policies, York had no obligation to indemnify the insureds for losses arising from the daycare business. York's concern is directed at the potential for exposure to claims pled against the homeowner's policy by users of the daycare business.

[¶ 3] The first insured had homeowner's insurance with York since 1994. They obtained a license to operate a home daycare in 1998, and opened the business in 1999. The homeowner asked York to provide coverage for the daycare. York refused. The homeowner then obtained commercial liability coverage for the daycare business from another carrier. According to York, it did not discover the first insured's home daycare business until February 2002, in the course of collecting information related to their automobile policy. Shortly thereafter, York sent a notice of nonrenewal, effective June 10, 2002.

[¶ 4] The second insured had homeowner's insurance with York, or its predecessor, since 1984. They did not open their daycare business until 1999, at which time they obtained commercial liability coverage through another carrier. In May 2002, a York claims adjuster discovered the existence of the daycare business while investigating an unrelated claim. Shortly thereafter, York sent a notice of nonrenewal, effective December 14, 2002.

[¶ 5] The notice of nonrenewal, sent to both homeowners, stated:

> The reason for nonrenewal is THE INSURABILITY OF THIS RISK IS THREATENED DUE TO THE DISCOVERY OF THE BUSINESS CONDUCTED ON THE PREMISES. THE INSURED IS CURRENTLY OPERATING A DAY CARE BUSINESS ON THE INSURED PREMISES SUBSTANTIALLY INCREASING OUR LIABILITY EXPOSURE.

Both policyholders made a timely request for a hearing before the Superintendent pursuant to 24–A M.R.S.A. § 3054 (2002), to contest York's decision not to renew the policies.

[¶ 6] Hearings on these challenges were held before a hearing officer for the Superintendent of Insurance in the summer of 2002. In general, York presented the same evidence in both cases. Relying on

---

1.  The exclusions provided as follows:

    **Section II—Exclusions**
    1.  **Coverage E—Personal Liability** and **Coverage F—Medical Payments to Others** do not apply to **"bodily injury"** or **"property damage"**:
    . . .;
    b.  Arising out of or in connection with a **"business"** engaged in by an **"insured."**

2.  The endorsements provided as follows:

If an "insured" regularly provides home day care services to a person or persons other than "insureds" and receives monetary or other compensation for such services, that enterprise is a "business". . . . Therefore, with respect to a home day care enterprise which is considered to be a "business", this policy:
1.  Does not provide Section II—Liability Coverages because a "business" of an "insured" is excluded under exclusion 1.b. of Section II—Exclusions[.]

our opinion in *Elliott v. Hanover Insurance Co.,* 1998 ME 138, 711 A.2d 1310, a York representative testified that the company could be required to defend lawsuits arising from the daycare business even though the policy excludes coverage for business-related losses because, under Maine law, an insurer's duty to defend is broader than the duty to indemnify. In *Elliott,* we determined that the insurer of a homeowner's policy with a business pursuits exclusion had a duty to defend a claim arising out of the homeowner's on-premises business activity because, as pled, the action was potentially within the policy's coverage. *Id.* ¶¶ 6–7, 711 A.2d at 1312.

[¶ 7] The York representative submitted York's underwriting guidelines for homes with daycares. She stated that York is no longer issuing new policies if there is a daycare in the home, and will renew a homeowner's policy only if York also writes the commercial liability policy for the daycare. She provided a communication from York's in-house counsel stating that the presence of a daycare is related to insurability of the property and that "we do not insure daycare exposures."

[¶ 8] The representative further testified that the home daycare business is not a market that York is targeting, and that the premiums for homeowner's insurance do not take into account the increased exposure due to the presence of the daycare. York indicated particular concern about (1) liability exposure due to possible child sexual molestation claims that may lie dormant for years after the policy period expires, and (2) increased liability exposure under the homeowner's policy for ordinary incidents such as slip-and-falls due to the greater number of people who come on to the property. York also submitted copies of summaries of cases from other jurisdictions showing that other insurance companies have had to pay claims arising from a home daycare business, even though the policies had business pursuits exclusions.

[¶ 9] At the first hearing, York's representative testified about several homeowners' claims that York had paid when there was a dispute as to whether the insured's loss was personal or arose from a home daycare business. No documentation was provided regarding these claims, and none of the cases had been litigated. At the second hearing, the York representative provided records of defense costs paid by York for an insured who had been accused of dumping chemicals on his property, even though the policy contained a pollution exclusion. She did not provide specific information about the claim or whether another policy existed that might have covered the loss.

[¶ 10] Based on this evidence, the hearing officer found that York had not established a reason, "rationally related to the insurability of the property" for nonrenewal under 24–A M.R.S.A. § 3051. The hearing officer stated in findings in both cases that "[n]o evidence was submitted to suggest a lawsuit or claim has ever been brought under the policy in question, nor was any documentary proof submitted to demonstrate an increased likelihood of a suit being brought solely as a result of the existence of the daycare operations." Because the policyholders each had a commercial liability policy covering the business, the hearing officer concluded that "a policy specifically covering the business exposure would respond to any daycare-related claims, thus shielding the homeowners policy, at least in part, from any duty to defend." This finding recognized that "in part" the homeowner's policy was not shielded and that the separately insured home daycare business could result in increased duty to defend exposure for the York homeowner's policy. Pursuant to its authority under 24–A M.R.S.A. § 3054

(2000), the hearing officer ordered York to renew the two policies on the same terms as the expiring policies.

[¶ 11] York appealed the decisions to the Superior Court, which consolidated the cases for the appeal. The Superior Court vacated the hearing officer's decisions and determined that the hearing officer's finding, that York had not met its burden of proof, was not supported by substantial evidence in the record. The Superintendent then brought this appeal.

[¶ 12] We are asked to determine whether we should defer to the Superintendent's interpretation of the statutory standard for nonrenewal of property insurance or whether the statute plainly compels a different interpretation. We are further asked to decide whether, on the administrative record, York met its burden of proof pursuant to the appropriate standard.

## II. STANDARD OF REVIEW AND RULES OF CONSTRUCTION

[¶ 13] On an appeal from intermediate appellate review of an administrative decision, we directly review an agency's decision for an abuse of discretion, error of law, or findings not supported by the evidence. *Fryeburg Health Care Ctr. v. Dep't of Human Servs.*, 1999 ME 122, ¶ 7, 734 A.2d 1141, 1143. Where the question is one of statutory interpretation we review for errors of law. *Botting v. Dep't of Behavioral and Developmental Servs.*, 2003 ME 152, ¶ 9, 838 A.2d 1168, 1171. We "accord due consideration to the Superintendent's interpretation and application of technical statutes and regulations and will overturn the Superintendent's action only if the statute or regulation plainly compels a contrary result." *Consumers for Affordable Health Care v. Superintendent of Ins.*, 2002 ME 158, ¶ 30, 809 A.2d 1233, 1242 (quoting *Maine AFL–CIO v.*

*Superintendent of Ins.*, 595 A.2d 424, 429 (Me.1991)).

[¶ 14] When interpreting a statute, we first examine the plain meaning of the statutory language, attempting to give effect to the legislative intent. *Botting*, 2003 ME 152, ¶ 10, 838 A.2d at 1171. "In doing so, we consider the entire statutory scheme, so that a harmonious result may be achieved. If the plain meaning of the statute is clear, we need investigate no further." *Id.* (Citation omitted.)

[¶ 15] With respect to the burden of proof issue, "[w]hen an agency concludes that the party with the burden of proof failed to meet that burden, we will reverse that determination only if the record compels a contrary conclusion to the exclusion of any other inference." *Hale–Rice v. Maine State Ret. Sys.*, 1997 ME 64, ¶ 17, 691 A.2d 1232, 1237 (quoting *Douglas v. Bd. of Trs.*, 669 A.2d 177, 179 (Me.1996)).

## III. LEGAL ANALYSIS

[¶ 16] York's actions are governed by the Maine Property Insurance Cancellation Control Act. The Act gives policyholders certain rights and restricts insurers' capacity to freely cancel or decline to renew various types of property and casualty policies, when the policy has been in effect 60 days or more. 24–A M.R.S.A. §§ 3048–3056 (2000). Once the Act's protections attach, if an insurer wishes not to renew a policy, the insurer must notify the insured at least 30 days in advance of the renewal date and provide the insured with an explanation of its reasons for nonrenewal. 24–A M.R.S.A. § 3051.

[¶ 17] The insured may then request a hearing to contest the nonrenewal. 24–A M.R.S.A. § 3054. The purpose of the hearing is "limited to establishing the existence of the proof or evidence used by the

insurer in its reason for cancellation or intent not to renew." *Id.*

[¶ 18] The statute at issue in this case, requiring that the insurer provide reasons for nonrenewal, provides, in relevant part:

The reason or reasons for the intended nonrenewal action shall accompany the notice of intent not to renew and the reason or reasons shall be explicit. Explanations such as "underwriting reasons," "underwriting experience," "loss record," "location of risk," "credit report" and similar insurance terms are not by themselves acceptable explanations of an insurer's intended nonrenewal of a policy insuring property of the kind defined in section 3048. *The reason for nonrenewal shall be a good faith reason rationally related to the insurability of the property.*

24–A M.R.S.A. § 3051 (emphasis added).

[¶ 19] The insurer bears the burden of proving that its "good faith reason" for nonrenewal is rationally related to the insurability of the property. 24–A M.R.S.A. § 3054. The insurer must do so by "establishing the existence of the proof or evidence used by the insurer in its reason for cancellation or intent not to renew." *Id.*

■ [¶ 20] York's good faith is not in question. The issue is whether, on the administrative record, York established a reason that is rationally related to insurability of the property, for declining to renew the two homeowners' policies.

[¶ 21] The term "rationally related" is commonly used in judicial decisionmaking. It connotes a low level of scrutiny in constitutional law cases, requiring proof only of a "reasonably conceivable state of facts [that] could provide a rational basis" for the challenged government action. *Fed. Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); *see also Green v. Comm'r of Mental Health and Mental Retardation*, 2000 ME 92,

¶ 21, 750 A.2d 1265, 1272–73; *Beaulieu v. City of Lewiston*, 440 A.2d 334, 338–39 (1982). The word "rational," standing alone, commonly means "consistent with or based on reason; logical." THE AMERICAN HERITAGE DICTIONARY 1028 (2nd College ed. 1991). "Insurable" is defined as "capable of being insured against loss, damage, illness, death, etc.; proper to be insured as based on standards of insurer; affording a sufficient ground for insurance." BLACK'S LAW DICTIONARY 802 (6th ed. 1990).

■ [¶ 22] A decision not to renew homeowner's insurance is not *per se* irrational because it is not supported by empirical data. The statute does require the insurer to present the "proof or evidence" used in formulating its intent not to renew. 24–A M.R.S.A. § 3054. However, the Legislature's choice of the term "rationally related," with its commonly associated meaning, indicates that what is required is proof of "a reasonably conceivable state of facts" establishing that the insurer's decision is founded in reason, rather than being based on whim or caprice, and is related to the insurability of the property. Here, the hearing officer found that the commercial policy on the daycare operations would address daycare related claims, "thus shielding the homeowner's policy *at least in part,* from any duty to defend." (Emphasis added.) That finding inferentially accepted York's position that the daycare operation—though separately insured—would increase its duty to defend exposure. That is consistent with the law we articulated in *Elliott v. Hanover Insurance Co.*, 1998 ME 138, 711 A.2d 1310, and other cases indicating that the duty to defend is determined solely by comparing the pleadings with the policy, without regard to what other policies might be available to respond to the claim. *Id.* ¶¶ 6–7, 711 A.2d at 1312.

[¶ 23] In another case involving York, *York Insurance Group of Maine v. Lambert,* 1999 ME 173, 740 A.2d 984, we held that a duty to defend could arise not just from what was alleged in a complaint, but from what could be alleged in a complaint. We stated that a duty to defend arises if a complaint reveals "a potential" that facts ultimately proved may come within coverage. *Id.* ¶ 4, 740 A.2d at 985. We also held that, before the underlying action is concluded, an insurer cannot avoid a duty to defend by establishing that ultimately there will be no duty to indemnify. *Id.* ¶ 5; *see also Penney v. Capitol City Transfer, Inc.,* 1998 ME 44, ¶ 4, 707 A.2d 387, 388.

[¶ 24] Accordingly, on the record, York established, without dispute, that (1) a daycare business will increase traffic to and at the property covered by its homeowner's policy; (2) increased traffic increases the risk that a greater number of claims could arise, compared to what would occur on a normal homeowner's property without an associated daycare business drawing people to the property; and (3) York would have a heightened exposure to a duty to defend claims arising on the property covered by its homeowner's policy, even if those claims arose from the on-premises business activity.

[¶ 25] Thus, as a matter of fact and law, York met its burden under 24-A M.R.S.A. § 3054 to establish a reasonably conceivable set of facts related to insurability that provides a rational basis for its decision not to renew pursuant to 24-A M.R.S.A. § 3051. York demonstrated that it could face increased costs and exposures, stemming from its duty to defend business-related claims under its homeowner's policy. Exposure to a partial additional risk because of the presence of the daycare business in the home is a sufficient good faith reason not to renew that is "rational-ly related to the insurability of the property."

[¶ 26] Accordingly, the statute and the administrative record support the conclusion reached by the Superior Court.

The entry is:

Judgment affirmed.

CALKINS, J., files dissenting opinion.

CALKINS, J., dissenting.

[¶ 27] I respectfully dissent. I would vacate the judgment of the Superior Court, thereby affirming, and deferring to, the Superintendent's decision.

[¶ 28] When we review an administrative decision we uphold the decision unless the agency has abused its discretion, made an error of law, or its findings are not supported by the evidence. *Reardon v. Dep't of Human Servs.,* 2003 ME 65, ¶ 5, 822 A.2d 1120, 1122. We do not substitute our judgment for that of the agency. *Seider v. Bd. of Exam'rs of Psychologists,* 2000 ME 118, ¶ 29, 754 A.2d 986, 993. We do not overturn the agency's factual findings unless the evidence compels a contrary finding. *Green v. Comm'r of the Dep't of Mental Health, Mental Retardation and Substance Abuse Servs.,* 2001 ME 86, ¶ 9, 776 A.2d 612, 615. "[T]he unsuccessful party at the trial level, in order to disturb the [agency's] findings, [has the] burden to show *more* than that there was competent evidence to support [its] position; [it] has to demonstrate that there was *no competent evidence* to support those findings." *Id.* ¶ 12, 776 A.2d at 616.

[¶ 29] In my view, the issue on appeal is whether York Insurance has shown that there was no competent evidence to support the Superintendent's finding that the insurer's stated reason for nonrenewal was not rationally related to the insurability of the property. I would not conclude that the evidence presented by York Insurance

compelled a finding by the Superintendent that the insurer's reason for nonrenewal was rationally related to the property's insurability. York Insurance did not produce evidence before the Superintendent in the way of empirical data, claims information, or loss experience to support its speculation of possible exposure to defend against a claim. It was reasonable for the Superintendent to take into consideration the commercial policy covering the daycare business. The Superintendent viewed the evidence and concluded that the proof presented by York Insurance as to its reason for nonrenewal was not rationally related to the property's insurability. Questions of insurability invoke the expertise of the Superintendent. I would defer to the Superintendent's judgment because of the Superintendent's knowledge of the insurance industry and expertise in evaluating the evidence produced by the insurer.

[¶ 30] I disagree with the Court's framing the issue as one of statutory construction, specifically the interpretation of the phrase "rationally related" in 24-A M.R.S.A. § 3051 (2000). The phrase is not ambiguous, and there is no need to employ the rational basis test of constitutional litigation.[3] As used in the context of section 3051, the phrase simply means that the rationale given for nonrenewal has to bear a relationship that is reasonable to the insurability of the property.

[¶ 31] I further disagree with the Court's conclusion that the phrase "rationally related" has the same meaning as the rational basis test in equal protection litigation. The traditional rational basis test means that when government makes classifications that are neither suspect nor involve fundamental rights, the classifications are

upheld if they are rationally related to a legitimate governmental purpose. The Court today borrows the meaning of the phrase from the case that uses it in its most minimal sense, and ironically, in its most deferential sense. *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). However, as judges and commentators have acknowledged, the rational basis test in equal protection cases has been fluid. *See, e.g., Cent. State Univ. v. Am. Assoc. of Univ. Professors, Cent. State Univ. Chapter*, 526 U.S. 124, 132, 119 S.Ct. 1162, 143 L.Ed.2d 227 (1999) (Stevens, J., dissenting) (comparing various articulations of the rational basis test); *Cleburne v. Cleburne Living Ctr., Inc.* 473 U.S. 432, 456–57, 105 S.Ct. 3249, 87 L.Ed.2d 313 (Marshall, J., dissenting in part) (criticizing the Court for stating that it was applying the rational basis test when it was not); Ronald D. Rotunda & John E. Nowak, 3 Treatise on Constitutional Law § 18.3(6), at 226 (3d ed. 1999) (stating that the meaning of the rational basis test is not clear). Sometimes "rationally related" as used in equal protection cases means minimal rationality, and sometimes it means more.

[¶ 32] It is difficult to believe that the Maine Legislature, when it used the phrase "rationally related" in 24-A M.R.S.A. § 3051, intended the term to carry the heavy and shifting load of constitutional meaning, as opposed to the ordinary common sense meaning without the implication of "minimal" or other adjectives that have been added in constitutional cases. If the Legislature had intended that an insurance company could refuse to renew an insurance policy when it could show a "reasonably conceivable state of facts" re-

---

3. If the phrase is ambiguous, we should defer to the agency's interpretation of it, as long as that interpretation is reasonable, because the agency is charged with the implementation of the statute and the agency's expertise is ap-

propriately utilized in determining its meaning. *Conservation Law Found., Inc. v. Dep't of Envtl. Prot.*, 2003 ME 62, ¶ 23, 823 A.2d 551, 559; *Guilford Transp. Indus. v. P.U.C.*, 2000 ME 31, ¶ 11, 746 A.2d 910, 913.

1163

lated to insurability "that could provide a rational basis" for the nonrenewal, it would have said so. Instead, the Legislature simply used the term "rationally related," unencumbered with descriptive and limiting clauses. The very fact that the Court has had to equate "rationally related" with "reasonably conceivable," demonstrates that we should defer to the Superintendent to whom the Legislature has delegated the responsibility for deciding whether the insurer's reason for nonrenewal is "rationally related."